<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| VICTOR CODY, | |
| Petitioner, | |
| v. | Civil Action No. 20-20387 (BRM) |
| CINDY SWEENEY, | **OPINION** |
| Respondent. | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Petitioner Victor Cody's ("Petitioner") amended petition for a writ of habeas corpus ("Amended Petition") brought pursuant to 28 U.S.C. § 2254. (ECF No. 10.) Following an order to answer (ECF No. 11), Respondent Cindy Sweeney ("Respondent") filed a response to the petition (ECF No. 16) and Petitioner did not file a reply. Having reviewed and considered, for the reasons set forth below and for good cause having been shown, Petitioner's Amended Petition is **DENIED**, and no certificate of appealability shall issue.

**I. BACKGROUND**

The New Jersey Superior Court, Appellate Division provided the following factual summary on direct appeal:[1]

> On April 20, 2012, Surjit Singh was working as an attendant in a service station at the corner of Frelinghuysen and Meeker Avenues

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

in Newark. As Singh began to pump fuel into a truck, two men, later identified by Singh as Joseph and Victor Cody [("Petitioner")], beat and robbed him. [Petitioner] grabbed Singh from behind and took money from his pocket, while Joseph hit Singh in the face with a metal object, fracturing his left cheek. Singh was able to see both men as they fled.

A surveillance video shows Singh walking toward the truck before the attack at 12:21 p.m. Singh is seen walking around the front of the truck to the driver's side, out of camera range. Less than one minute later, two men can be seen walking around the front of the truck. One of the men wore a hooded coat while the other wore a shirt with a distinctive cross pattern on the back, similar to one recovered after the robbery.

Lorraine Bellamy was at the station and witnessed the robbery, but could not identify anyone. Tashon Brown, an off-duty firefighter, was in the station's convenience store at the time of the robbery. Bellamy told Brown that a man had been robbed and the attackers fled through the park across the street. She described one of the robbers as wearing a dark blue jacket and the other as wearing a white shirt or sweatshirt. Bellamy also told Brown that one of the men had a "low" haircut while the other had longer braids.

Brown told Bellamy he was "going to get them people" and drove out of the station in the direction that Bellamy saw the men fleeing. Brown radioed a report of the robbery and a description of the suspects he had been given to his fire department dispatch. As Brown approached Dayton Street, he spotted two men fitting the description of the robbers in the park who were hastily removing some of their clothing. Brown informed dispatch as he followed the men out of the park and observed them enter a gold Nissan Maxima.

Brown followed the Nissan southwest on Dayton to Foster Street and then north on Frelinghuysen, while simultaneously relaying the license plate number and location of the Nissan to his dispatch. Brown's information was, in turn, relayed to Newark police.

As Brown was following the Nissan, Newark Police Officer Jimmy Rios and his partner Exmil Gonzalez received the report of the robbery and spotted the Nissan. Rios followed the Nissan and initiated a traffic stop. Brown continued to follow the Nissan until it was stopped by police; he then returned to the gas station.

The officers identified Arthur Armstrong as the driver of the Nissan. Joseph Cody was sitting in the front passenger seat, while

2

[Petitioner] was in the back seat. Rios told the occupants of the car to keep their hands visible. Armstrong and Joseph complied, but [Petitioner] kept his hands near his waistband. After [Petitioner] failed to comply with a second command to show his hands, Rios drew his gun and again instructed [Petitioner] to show his hands. [Petitioner] complied and, after he and the occupants were removed from the vehicle, [Petitioner] was patted down and a bundle of money totaling $1,319 was found in his waistband. A black hoodie and a grey shirt with a distinctive cross design were recovered from the vehicle.

All three men were arrested and taken in separate cars back to the gas station to see if Singh could identify them. Before Singh saw [Petitioner] and Joseph, Rios told Singh that the men he would see may not have been involved in the crime and he was under no pressure to identify anyone. Singh identified both defendants as the ones who robbed and beat him. Specifically, Singh said [Petitioner] was the one who held him and Joseph struck him in the eye with a metal object. The show-up was partially recorded on the surveillance camera. Although there is no audio, the video contains a time reference which indicates that the show up began at 12:36 p.m., fifteen minutes after the robbery. Singh testified at trial that, when he identified defendants on April 20, 2012, he was one hundred percent sure that they were the people who robbed him. . . .

. . .

The judge also conducted a brief pretrial hearing to determine the admissibility of the 911 call, and fire department dispatch and police recordings of the incident. The State offered the recordings as non-testimonial business recordings and present sense impressions. The judge admitted portions of the recordings.

The 911 recording was admitted because the statements were non-testimonial and meant to resolve an emergency, the speaker was referring to events as they were happening, and the "call was plainly a call for help against a bona fide physical threat." The judge also found that portions of the 911 recording were admissible under the present sense impression and the excited utterance exceptions to the hearsay rule.

The segment of the fire department dispatch recording that was admitted was determined to be non-testimonial and fell under the present sense impression hearsay exception.

*State v. Cody*, No. A-5005-13T2, 2016 WL 3369531, at *2–4 (N.J. Super. Ct. App. Div. June 20, 2016) (footnotes omitted). On collateral appeal, the Superior Court noted that:

> After eleven hours of deliberations, the jury reported they were at an impasse. The trial court, who was also the PCR court, instructed the jury to continue its deliberations, gave the instruction approved in *State v. Czachor*, 82 N.J. 392 (1980), and provided a written copy of the jury charge over the objection of defense counsel. The jury also heard readbacks of Singh and Lorraine Bellamy's testimony.

*State v. Cody*, No. A-0754-18T2, 2020 WL 2601974, at *1 (N.J. Super. Ct. App. Div. May 22, 2020).

Petitioner was convicted of second-degree conspiracy to commit robbery, N.J.S.A. § 2C:5-2 and N.J.S.A. § 2C:15-1(b); first-degree robbery, N.J.S.A. § 2C:15-1; fourth-degree unlawful possession of a weapon, N.J.S.A. § 2C:39-5(d); and third-degree possession of a weapon with an unlawful purpose, N.J.S.A. § 2C:39-4(d). *Cody*, 2016 WL 3369531, at *1; (ECF No. 18-2 at 2.). The trial court sentenced Petitioner to a term of twenty-five years imprisonment with an eighty-five percent period of parole ineligibility, pursuant to the No Early Release Act (NERA), N.J.S.A. § 2C:43-7.2, and five years of parole supervision upon release. *Id;* (ECF No. 18-2 at 2)*.* The judge also imposed a discretionary extended term for persistent offenders under N.J.S.A. 2C:43-7.1(b). *Id;* (ECF No. 18-2 at 2)*.*

Petitioner filed a Notice of Appeal with the Appellate Division. On June 20, 2016, after consolidating Petitioner's and his brother, Joseph Cody's, appeals, the Appellate Division affirmed Petitioner's conviction and sentence. *Cody*, 2016 WL 3369531, at *13; (ECF No. 18-5.). The New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Cody*, 228 N.J. 503 (2017).

Petitioner filed a post-conviction relief ("PCR") petition. (ECF No. 18-6.) On June 1, 2018, the PCR court denied his petition. (ECF No. 18-7.) Petitioner appealed, and the Appellate Division

affirmed the denial. *State v. Cody*, No. A-0756-18T2, 2020 WL 2601977 (N.J. Super. Ct. App. Div. May 22, 2020); (ECF No. 18-13.). The New Jersey Supreme Court denied certification in July 2021. *State v. Cody*, 248 N.J. 215 (2021).

Petitioner filed his initial habeas petition in December 2020. (ECF No. 1.) In May 2021, Petitioner filed an amended habeas petition and a motion to stay. (ECF Nos. 5, 6.) In July 2021, the Honorable John Michael Vazquez, U.S.D.J. (ret.) granted Petitioner's motion to stay. (ECF No. 7.) In August 2021, the stay was lifted (ECF No. 9) and Petitioner filed the instant Amended Petition (ECF No. 10). Respondent filed an answer. (ECF No. 16.) In March 2023, Petitioner withdrew his unexhausted habeas claim (ground ten) and requested to proceed on the merits of the remaining claims. (ECF No. 22.) Petitioner did not file a reply. On September 14, 2023, this matter was reassigned to the undersigned for all further proceeding. (ECF No. 24.)

## II.    LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, provides that the district court "shall entertain an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). District courts are required to give great deference to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (*citing Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (*quoting Renico*, 559 U.S. at 773). As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 574 U.S. at 316. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on

6

credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

Finally, to the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## III. DECISION

### A. Ineffective Assistance of Counsel (Grounds One, Two, and Three)

In Grounds One, Two, and Three, Petitioner argues that trial counsel and appellate counsel provided ineffective assistance. (*See* ECF No. 10 at 21–25.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted). A petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690–91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690–91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See Strickland*, 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232 (quoting *Harrington*, 562 U.S. at 101). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Pinholster*, 563 U.S. at 190). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

Considering this standard, the Court will address Petitioner's Grounds One, Two, and Three in turn.

### 1. Ground One: Ineffective Assistance of Trial Counsel—Failure to Move to Suppress Inadmissible Evidence

In his first ground for habeas relief, Petitioner argues that trial counsel was ineffective for failing to file a motion to suppress the evidence seized following the April 20, 2012 motor vehicle stop. (ECF No. 10 at 18–22.) Petitioner argues the evidence seized was "fruits of an unlawful arrest." (*Id.* at 20, 22.) Petitioner claims that his "arrest" was based on a "fourth party's assumption that the occupants of the vehicle Petitioner was a passenger in, [were] involved in the robbery." (*Id.* at 19.) Petitioner argues the state court's finding that he was subject to an investigatory stop,

rather than an arrest, was "not based on a reasonable determination of facts established in the record." (*Id.* at 21–22.)

Petitioner raised his ineffective assistance of counsel claim on collateral appeal. The Appellate Division summarized the PCR court's factual analysis as follows:

> Ultimately, the PCR court concluded [Petitioner] failed to demonstrate that either his trial counsel or appellate counsel was ineffective. More specifically, the PCR court found the restraint on [Petitioner's] liberty "arose to an investigative detention, rather than a custodial arrest," pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). The PCR court noted that "[s]ome restraint of a suspect's liberty is inherent in a 'show-up'" and the detention was no longer than reasonably necessary to facilitate the identification process, which lasted fifteen minutes. Therefore, the PCR court determined that [Petitioner] failed to establish his trial counsel was ineffective for failing to move to suppress the show-up identifications under Rule 3:5A.
>
> The PCR court found [Petitioner] was not arrested until Singh identified him and Joseph Cody as the perpetrators. The PCR court determined that, at that point, the officer had probable cause to arrest [Petitioner] and the cash was properly seized incident to the arrest. [Petitioner's] clothing was observed under the plain view exception, being visibly displayed inside the vehicle on the front passenger floor, when defendant and the two occupants were removed.

*Cody*, 2020 WL 2601977 at *2. The Appellate Division affirmed the PCR court's denial of Petitioner's claim "substantially for the reasons expressed by the PCR court" and added the following:

> We first turn to [Petitioner's] contention that he was denied effective assistance of trial counsel because his attorney did not file a motion to suppress evidence obtained at the time of the stop. [Petitioner] argues he was under arrest, not merely detained, because he was placed against the car, patted down, handcuffed, and subjected to a show-up identification. We disagree.
>
> To prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our Supreme Court in *State v. Fritz*, 105 N.J. 42, 58 (1987). The first prong of the

*Strickland* test requires a defendant to show that his or her attorney's performance was deficient. *Strickland*, 466 U.S. at 687.

To do so, a defendant must establish that counsel's alleged acts or omissions fell "outside the wide range of professionally competent assistance." *Id.* at 690. This requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To satisfy the second prong of *Strickland*, the defendant "must show that the deficient performance prejudiced the defense." *Ibid.* The defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "These standards apply to claims of ineffective assistance at both the trial level and on appeal." *State v. Guzman*, 313 N.J. Super. 363, 374 (App. Div. 1998) (citations omitted).

. . .

Having carefully considered [Petitioner's] arguments, we affirm substantially for the reasons expressed by the PCR judge in his well-reasoned written opinion. We add the following comments.

[Petitioner's] contention that the PCR court erred in rejecting the claim that his trial counsel was ineffective for not filing a motion to suppress evidence lacks merit. Here, Brown was in the gas station's convenience store when the robbery took place. He followed [Petitioner] and co-defendant Joseph Cody and saw them enter the Nissan. Brown called the police and provided them with the license plate number and the location of the vehicle.

The police stopped the Nissan and ordered [Petitioner] and his brother out of the car. The PCR court noted that [Petitioner] failed to comply with the officer's commands to show his hands until the officer produced a service weapon. Defendants were brought back to the gas station for a show-up identification. Singh identified [Petitioner] and his brother as the perpetrators of the robbery and assault fifteen minutes after the acts were committed. According to Singh, [Petitioner] held him while Joseph Cody struck him with a metal object.

We are convinced the PCR court properly rejected [Petitioner's] argument and denied the petition. The record supports the PCR court's finding that [Petitioner] and his brother were not arrested until after Singh identified them as the perpetrators. They were

> stopped and detained on reasonable suspicion pending the identification procedure. The PCR court aptly found that the detention was no longer than reasonably necessary to facilitate the identification process.

*Id.* at *3-4.

As to the evidence of cash seized and clothing, the PCR court found that trial counsel was not ineffective for failing to file a meritless motion to suppress, reasoning as follows:

> As to the cash on [Petitioner]'s person, petitioner concedes that the police officer had reasonable suspicion to pat him down to [e]nsure officer safety at the scene of the motor vehicle stop. At trial, Officer Rios testified that he discovered a bundle of cash in [Petitioner's] waistband during a *Terry* frisk for weapons. The cash was not confiscated at that time and "at that point in time the money was allowed to remain on [Petitioner]." It was not until [Petitioner] was returned to the gas station and identified by the victim that the officer took possession of the money. Petitioners were not arrested until after they were positively identified by the victim within fifteen minutes of the robbery. At that time, the officer had probable cause to arrest and perform a search incident thereto. *See Weeks v. United States*, 232 U.S. 383, 392 (1914). The cash was properly seized incident to that lawful arrest.
>
> . . .
>
> Petitioners further claim that trial counsel should have moved to suppress the clothing—a black hooded sweatshirt and a graphic t-shirt bearing a cross design on the back—which were located within the passenger compartment of the vehicle. Petitioners argue that a search occurred, and that this should be suppressed because no search warrant was obtained and no exigency was established. However, it is well established that "a simple observation into the interior of an automobile by a police officer located outside of the automobile is not a search.". . . Since the clothing was observable from outside of the motor vehicle, [P]etitioners had no reasonable expectation of privacy concerning that clothing and no "search" occurred.
>
> . . .
>
> When the officers stopped the Maxima, they reasonably suspected that its occupants committed an armed robbery. Upon stopping this car, the officers instructed the passengers to keep their hands visible.

[Petitioner] did not comply with the officer's repeated order to show his hands until the officer produced his service weapon. Accordingly, the officers had sufficient objective justification to remove the driver (Mr. Armstrong) and both passengers (Cody brothers) from the vehicle. *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (vehicle frisk); *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (driver exit). When these occupants were lawfully removed from the vehicle, the clothing remained visible on front passenger floorboard.

Officer Rios also testified that, at the time the three suspects were removed from the vehicle, he took pictures of the interior of the Maxima. The pictures depicted a black hooded sweatshirt and a light colored shirt at the front passenger side floorboard. This clothing was in the plain view of the officer and was similar to the initial description of the robbers given by the crime scene witness and corroborated by the surveillance video.

. . .

Assuming arguendo that the clothing was not lawfully seized, the vehicle would have been subject to inventory search after being impounded, due to arrests of all vehicle occupants. Thus, since several independent grounds exist to deny a motion to suppress the clothing, petitioners have failed to establish deficient performance as required under *Strickland's* first prong.

Application of *Strickland's* second prong also compels denial of [this claim]. Apart from the physical evidence seized, the victim's unequivocal identification of the petitioners and the surveillance video depicting the criminal incident provided ample independent evidence to support the convictions.

(ECF No. 18-7 at 19-21 (footnotes and citations omitted).)

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Unless an exception applies, a seizure "must be effectuated with a warrant based on probable cause" in order to be reasonable under the Fourth Amendment. *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). One such exception to the warrant requirement was established in *Terry v. Ohio*, 392 U.S. 1 (1968). When a police officer has a "reasonable, articulable suspicion that criminal activity is afoot," he may conduct a brief, investigatory stop without a

warrant, i.e., a "*Terry* stop." *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . . ." *Id.* However, an officer must "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity" to establish reasonable suspicion. *Id.* at 124 (quoting *Terry*, 392 U.S. at 27).

When making a *Terry* stop, a police officer "must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Officers may also "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Brown*, 765 F.3d 278, 290 (3rd Cir. 2014) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Courts "give considerable deference to police officers' determinations of reasonable suspicion." *Id.* at 290. If a *Terry* stop is conducted without reasonable suspicion of criminal activity, any evidence obtained must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (internal quotation marks omitted).

When a brief investigatory stop exceeds the time needed to effectuate the purpose of the stop, it becomes a *de facto* arrest that requires probable cause. *See United States v. Sharpe*, 470 U.S. 675, 685–86 (1985). Nevertheless, the Supreme Court has declined to issue a bright-line rule as to when an investigatory stop becomes an arrest, preferring, instead, for courts to make such determinations based on 1) the diligence of the officers involved; 2) the degree to which the individuals' liberty is restrained; 3) and whether the officers transferred the individuals to another location during their detention. *See id.* ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is reasonable, common sense and ordinary human

14

experience must govern over rigid criteria."); *see*, *e.g.*, *United States v. Place*, 462 U.S. 696, 709-10 (1983) (finding a ninety-minute detention unreasonable based in part on the officers' lack of due diligence); *Lincoln v. Turner*, 874 F.3d 833, 841–42 (5th Cir. 2017) (explaining that the custodial arrest occurred when officers handcuffed the suspect and placed him in the police car for two hours); *United States v. Wrensford*, 866 F.3d 76, 87 (3d Cir. 2017) (finding the investigatory stop was converted to an arrest when the officers moved the suspects from the street to jail without any evidence that the officers did so for the safety of the suspects).

When "an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous," a *Terry* stop may include "a patdown search to determine whether the person is in fact carrying a weapon," but "must be strictly limited to that which is necessary for the discovery of weapons." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (internal quotation marks and citations omitted). If during the frisk for weapons, the officer feels an object whose "contour or mass makes its identity [as contraband] immediately apparent," the officer may seize it. *Id.* at 375–76.

Additionally, "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995) (collecting cases); *see also United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (surrounding a suspect "with weapons ready, and even drawn, does not constitute an arrest per se"). *Terry* recognized that when officers are investigating a suspect who the officers reasonably believe "is armed and presently dangerous to the officer[s] or to others, it would . . . be clearly unreasonable to deny the officer[s] the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

Also, "objects falling within the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced as evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968). This plain view doctrine allows for the warrantless seizure of an item when three requirements are met: (1) the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the incriminating character of the evidence must be immediately apparent; and (3) the officer must have a lawful right of access to the object itself. *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (citing *United States v. Menon*, 24 F.3d 550, 559–60 (3d Cir. 1994)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 466–68 (1971). When police observe an item left in plain view, "information obtained . . . may be the basis for probable cause or reasonable suspicion of illegal activity. In turn, these levels of suspicion may, in some cases . . . justify police conduct affording them access to a particular item." *Stabile*, 633 F.3d at 241 n.17 (quoting *Texas v. Brown*, 460 U.S. 730, 738 n.4 (1983)).

Under the fruit of the poisonous tree doctrine, "evidence gathered as a result of an unlawful search or seizure must be suppressed at trial." *United States v. Coggins*, 986 F.2d 651, 653 (3d Cir. 1993). Further, when a petitioner alleges that his trial counsel was ineffective for failing to litigate a Fourth Amendment claim, the petitioner must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *see also Wharton v. Vaughn*, 722 F. App'x 268, 273–74 (3d Cir. 2018).

Here, in finding counsel's performance was not deficient, the court found the state court did not violate clearly established law and was not unreasonable in their application of *Strickland*. The Appellate Division reasonably found that officers had reasonable suspicion to stop Petitioner's

16

vehicle. The PCR court noted that Lorraine Bellamy had witnessed the robbery and reported what she saw, including the perpetrators clothing, to firefighter Brown. (ECF No. 18-7 at 17.) The PCR court also noted the Brown gave chase and saw individuals meeting the description removing clothing and entering a gold Nissan. (*Id.*) Brown provided that information to the responding officers, who used the information to stop the vehicle Petitioner was in. (*Id.*) The state court did not unreasonably apply the facts to determine that officer's had reasonable suspicion to perform a *Terry* stop.

The state court's finding that Petitioner was subject to an investigatory stop and not an arrest until after the show-up identification was not an unreasonable application of clearly established federal law. *Eley*, 712 F.3d at 846. The state court found that the officers pulling a weapon, removing Petitioner from the vehicle, patting down Petitioner, and detaining him pending identification was within the parameters of *Terry*. *Cody*, 2020 WL 2601977 at *4. The state court noted that Petitioner did not comply with the officers' instruction to show his hands, therefore, the officer drew his weapon. *Id.* The PCR court also found it was reasonable for the officers to pat down Petitioner for safety reasons. (ECF No. 18-7 at 19.) Additionally, the Appellate Division found that detaining Petitioner for fifteen minutes pending identification was "no longer than reasonably necessary to facilitate the identification process." *Cody*, 2020 WL 2601977 at * 4; *see Sharpe*, 470 U.S. at 687–88 (1985) (20-minute detention not unreasonable while officer pursued investigation "in a diligent and reasonable manner" and did not delay unnecessarily); *United States v. Scott*, 816 F. App'x 732, 738 (3d Cir. 2020) (investigative stop not elevated to *de facto* arrest where "officers performed a pat down of Defendants and placed them in police vehicles long enough to bring the manager to the scene to determine if they were the robbers," "the entire process took nineteen minutes, and the record does not reflect any unnecessary delays"); *United States v.*

*Morrison*, No. 19-44, 2022 WL 130776, at *9 (W.D. Pa. Jan. 14, 2022) ("Defendant makes much of the fact that Officer Gillette did not 'know' that defendant had committed a theft and he had not witnessed a single act of criminal conduct by defendant. But this position misses the forest for the trees. It is the totality of the circumstances that supplies the viewpoint from which the propriety of a stop is to be evaluated."); *United States v. Pennycooke*, 566 F. Supp. 3d 304, 311 (E.D. Pa. 2021) ("The officers' actions were necessary to protect their personal safety and therefore did not turn the stop into an arrest. To find otherwise would be unreasonable.") (footnotes omitted).

Finally, as explained above, the PCR court explained that the cash was not seized until after Petitioner's arrest and the clothing seized was in plain view. (ECF No. 18-7 at 19–21.) Petitioner cannot show that the state court findings were an unreasonable application of federal law, nor were they an unreasonable determination of the facts. 28 U.S.C. § 2254(d). As the evidence was properly seized, any motion to suppress would have been meritless. Trial counsel cannot be found ineffective for failing to raise a meritless claim. *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.") *Parson v. Att'y Gen. of N.J.*, No. 19-10564, 2021 WL 4593317, at *8 (D.N.J. Oct. 5, 2021) ("As the state courts found that the motion in question would not have resulted in the suppression of the evidence in this case, and as that conclusion is well supported by applicable federal law, it is clear that the suppression motion Petitioner contends should have been filed was meritless, and the failure to file it cannot serve as a basis for finding counsel ineffective.") As such, Petitioner's first ground of habeas relief is denied.

### 2. Ground Two: Ineffective Assistance of Trial Counsel - Misadvising Petitioner During Plea Negotiations

In ground two, Petitioner argues that trial counsel was ineffective when he advised him "the video evidence would only be permitted during the hearing to suppress the show up identification and would not be permitted for use before the jury at trial." (ECF No. 10 at 22.) Petitioner also argues that trial counsel believed that due to the eyewitness' description being inconsistent with the clothing found, the clothing would not be introduced at trial. (*Id.* at 22.) Petitioner argues that he rejected a "favorable 10-year plea deal and elected to go to trial" based on trial counsel's advice. (*Id.*)

On collateral appeal, the Appellate Division summarized the following from the PCR court's denial of this claim:

> The PCR court recounted that [Petitioner] fully understood the State's plea offer, which set forth a cutoff date. The only outstanding motion at the time the plea offer was made was a *Wade* motion challenging Singh's identification. On the pretrial memorandum signed and initialed by [Petitioner], the PCR court found he acknowledged that if convicted, the sentence would be life imprisonment, with a seventeen-year period of parole ineligibility.

*Cody*, 2020 WL 2601977 at * 2. The Appellate Division then denied Petitioner's claim, reasoning as follows:

> We also reject [Petitioner's] argument that the PCR court erred in rejecting the claim that his trial counsel was ineffective by failing to accurately inform him of the severe sentence he faced if he turned down the plea offer. [Petitioner] asserted that if his attorney had been forthright about incriminating evidence being admitted at trial, he would have accepted the State's plea offer and not proceeded to trial. He claims his attorney told him that the evidence obtained after his arrest would not be used against him at trial because none of the witnesses had described the perpetrator's clothing.
>
> Where it is claimed that trial counsel's mistaken advice regarding potential sentencing exposure caused a defendant to reject a plea offer and proceed to trial, the defendant establishes prejudice under

> the second prong of the *Strickland* standard by demonstrating that he would have accepted the plea offer if he had been aware of his sentencing exposure, that his guilty plea would have been accepted by the court, and that the conviction and sentence he would have received under the plea offer would have been less severe than those resulting from the trial. *Lafler*, 566 U.S. at 161.
>
> As the PCR court correctly found here, [Petitioner] "fully understood the full extent of the plea offer before he decided to reject it." Page three of the pretrial memorandum was executed on the plea cutoff date and stated the only outstanding pretrial motion was the *Wade* hearing. Additionally, the PCR court noted there was no prejudice concerning [Petitioner's] understanding as to whether he could continue to litigate the suppression of physical evidence seized because "those motions lacked merit." The PCR court concluded that [Petitioner's] clothing was properly obtained pursuant to the plain view doctrine. The record supports the court's finding.

*Id.* at * 5.

In *Hill v. Lockhart*, the Supreme Court held that the same two-part standard for ineffective assistance of counsel claims announced in *Strickland* applies to ineffective assistance claims arising out of the plea process. 474 U.S. 52, 57–58 (1985). "[I]n order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59. In a later Supreme Court case, the Court held that where ineffective advice of counsel led to rejection of a plea offer, the prejudice prong of *Strickland* required the defendant to

> "show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been provided to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed."

*Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Appellate Division correctly identified the *Strickland*/*Lafler* standard as governing Petitioner's instant ineffective assistance of counsel contention. As a result, the state court's decision was not contrary to clearly established Supreme Court precedent.

Next, the Appellate Division reasonably applied the standard announced in *Lafler* in finding Petitioner had failed to show he was prejudiced by trial counsel's representation. *Cody*, 2020 WL 2601977 at * 5. The Appellate Division found that Petitioner's argument that he would have accepted a ten-year plea offer but for trial counsel's alleged advice that the clothes and video surveillance would not be introduced at trial is bellied by the record. *Id*. The Appellate Division first noted that Petitioner was aware of "the full extent of the plea offer before he decided to reject it." *Id* (quotations omitted). The Appellate Division then found that the pretrial memorandum signed by Petitioner also informed Petitioner that the only outstanding pre-trial motion was regarding the show-up identification (i.e., the *Wade* hearing). *Id*. At that time, Petitioner would have been aware that there were no other motions to suppress evidence outstanding. The Appellate Division applied the correct federal standard and found that Petitioner had not shown that but for counsel's advice, he would have accepted the plea offer. *Id*.

Additionally, the Court notes that Petitioner makes no argument regarding why, at the time the plea was offered, he believed that at trial he would receive a more favorable sentence than ten-years if the clothes and video were not introduced as evidence. (ECF No. 10 at 24). Petitioner makes no argument regarding why he believed the lack of those pieces of evidence would be so impactful at trial. (*Id*.) The remaining evidence against Petitioner was substantial. Petitioner was aware that the victim provided an eyewitness identification of Petitioner as the assailant and that there would be evidence introduced from the off-duty firefighter that he gave chase following the

21

assault and witnessed the individuals hastily removing clothes and getting into the vehicle that was later pulled over. *Cody*, 2020 WL 2601977 at *4. Knowing there was an eyewitness identification and the firefighter's testimony, Petitioner still chose to reject the plea offer.

Aside from his conclusory argument that he would have accepted the plea offer but for counsel's alleged advice that the clothes and video would not be evidence at trial, Petitioner offers no argument why he believed he would receive a sentence of less than ten-years imprisonment without those pieces of evidence. In sum, Petitioner has not demonstrated that the outcome of the plea process would have been different but-for his counsel's conduct, or that, considering the substantial evidence he knew would be introduced at trial, he would have been "reasonably likely" to accept the plea deal had counsel acted in an effective manner. *Morris v. Adm'r New Jersey State Prison*, 770 F. App'x 601, 607 (3d Cir. 2019); *see also Lafler*, 566 U.S. at 163–64 (2012). The Appellate Division did not unreasonably apply *Lafler* in finding Petitioner failed to show that but for counsel's advice, he would have accepted the plea offer. As such, this claim for habeas relief is denied.

### 3. Ground Three: Ineffective Assistance of Trial and Appellate Counsel- Failure to Challenge the Trial Court's Intrusion into Jury Deliberations

Petitioner next argues that trial and appellate counsel were ineffective for failing to challenge the trial court's intervention into jury deliberations. (ECF No. 10 at 24–25.) Petitioner claims trial counsel and appellate counsel should have challenged the trial court's supplemental charge and the trial court's comment that the court "expected to receive either a 'verdict' sheet or further communication." (*Id.* at 24.) Petitioner argues that trial and appellate counsel failed to address the trial court's decision not to ask the deadlocked jury whether further deliberations would likely result in a verdict. (*Id.*)

22

On direct appeal, Petitioner's co-defendant argued that he was denied a fair trial when the trial judge "improperly responded [to a] jury question with information never requested by the jury." *See Cody*, 2016 WL 3369531 at \*2. Petitioner adopted and incorporated this claim by reference into his direct appeal. *Id.* The trial court dismissed this claim pursuant to Rule 2:11-3(e)(2), finding the claim lacked "sufficient merit to warrant further discussion. *Id.* at \*13.

On collateral appeal, Petitioner argued that "trial counsel was ineffective for failing to object to the jury instruction following a jury note." (ECF No. 18-7 at 3.) Petitioner also argued that appellate counsel was ineffective for failing to raise this claim. (*Id.*) The PCR court summarized the jury's note and the trial court's instruction as follows:

> After deliberating for three days, the jury sent the court a note stating: "If the jury has exhaustively reviewed all the evidence multiple times and still finds itself at an irreconcilable impasse, how can we possibly proceed?" Trial counsel vehemently argued that the court should order a mistrial because the jury was at an impasse. The court decided to issue a modified *Allen* charge. *See Allen v. United States*, 164 U.S. 492,501-02 (1896). Trial counsel further objected to the court providing any written copy of this instruction to the jury. Overruling that objection, the court provided the trial counsel with a copy of *State v. O'Brien*, 200 N.J. 520 (2009), the rule, R. 1:8-8 (allowing for a modified jury instruction), and a written copy of the proposed instruction. No objections were made as to the substance of the charge. Ultimately, this court [] provided a written copy of this instruction to the jury.

(*Id.* at 7-8 (citations and footnote omitted).)

The PCR court dismissed Petitioner's claim that trial and appellate counsel were ineffective for failing to object to the jury instruction provided in response to the jury's note, finding the claim was barred under Rule 3:22-5. (ECF No. 18-7 at 24.) The PCR explained that trial counsel "expressly challenged [the trial court's] response to the jury note" and appellate counsel "also challenged [the trial court's] response to the jury note" on direct appeal. (*Id.*) The PCR explained that Rule 3:22-5 provides that "a prior adjudication upon the merits of any ground for the relief is

conclusive whether made in the proceeding resulting in the conviction. . . or in any appeal taken from such proceedings." (*Id* (internal quotation marks omitted)*.*) Alternatively, the PCR court dismissed Petitioner's claim that trial counsel was ineffective as meritless. (*Id.*) The PCR court explained that "trial counsel challenged the court on the issue of jury deliberations, the jury instructions, and the standard 'modified' *Allen* charge." (*Id.*) The PCR court found that trial counsel had raised the "exact issues petitioner now raises [on PCR appeal] as the ground for [his] ineffective assistance of counsel claim." (*Id.*)

Although the PCR court found Petitioner's claim that trial counsel was ineffective procedurally barred, Petitioner did raise the claim on direct appeal and the direct appeal court dismissed it as meritless. (ECF No. 18-5 at 33.)

As explained, Petitioner raises this claim as ineffective assistance of trial and appellate counsel for failing to argue that the trial court erred in providing an *Allen* instruction following the jury's note regarding being at an impasse. (ECF No. 10 at 25.) Petitioner's claim that trial counsel was ineffective for failing to challenge the trial court's *Allen* instruction is meritless. Upon receiving the note that the jury was at an impasse, the trial court informed counsel it was going to provide the jury with the following *Allen* charge:

> Court: I'll call it the standard modified *Allen* charge, which was included in C-13, modified as follows: I'll give the standard language and I'll show the difference.
>
> Standard: "It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if can you do so without violence to individual judgment."
>
> Standard: "Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors."
>
> Standard: "You are to consider" this is the inclusion – "You are to consider the evidence and apply it to the law as I instructed you

> before you began deliberations. For your convenience, I am providing you with a written copy of these instructions marked C-13 A, that's inserted."
>
> Standard: "In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Are you not partisans. Are you judges -- judges of the facts."

(ECF No. 18-24 at 4.)

Both trial counsel and co-defendant, Joseph Cody's, counsel objected making the following argument:

> Mr. Moncur [co-defendant's counsel]: Yes. I object to the inclusion of C-13. Deliberations began last Thursday, February 6th, I believe approximately quarter to four and they ended around five minutes -- excuse me -- around 4:25 on Thursday. They deliberated 2/7/14 -- that was a Friday -- all day. They sent out several notes asking for -- the last note asking for testimony of several witnesses several key witnesses in the case.
>
> At no time on Thursday or Friday or this past Monday, when their deliberations continued, have they asked for instructions or to be reinstructed on any aspect of the law, as your Honor read to them before their deliberations began.
>
> Now, they did have some issues amongst the deliberations in terms of disagreements. Some jurors may have felt like other jurors were looking at the evidence incorrectly or whatever the case may be, but that is for deliberations.
>
> So today after they sent out the note that you just read on the record, essentially, a note indicating that it might be headed towards a hung jury, or that they might not reach a verdict because they have disagreements, legitimate disagreements on the evidence, now we're giving them -- or the Court intends to give them a written copy of the instructions that were read to them before deliberations began. This implies -- this implies that a few of the jurors we don't know what's going on in there -- one, two, three -- this implies that a few of the jurors are not looking at the law correctly or the way this Court intended or the way other fellow jurors intended and it's kind of

inserting our -- or your -- your Honor's, I guess, observation of what's going on in the jury room.

"Hey, here is a copy of the law, just in case you guys need it. Here it is. Some of you guys might not be applying it correctly."

They haven't asked for that. I think the note is very clear, as many of them have been clear. It's about the evidence. It's about the recollection of the facts. It's about their knowledge of the evidence.

By giving them a copy of the written instructions, not us -- but the Court is saying some of you may not be doing this correctly. Not to mention that the last note was, in fact, a hung note or note saying that they may be headed towards not being able to reach a verdict. This will give the wrong impression. "This" being C-13, a copy of the written instructions, will give a wrong impression. It will now pit one juror's recollection of the facts against another juror's recollection of the facts.

If this was going to be done, it should have been done in a neutral forum, that is, -after deliberations first began, not after they spent almost two days amongst each other having disagreements about the evidence and their recollection of the facts as it relates to the evidence and their application of the law as it relates to the evidence.

They haven't even asked for an instruction on the law. I mean there was a Power Point display on the law, the charges. They haven't asked for re-instruction on reasonable doubt. They were instructed on, you know, passion and not being biassed jurors. That's fine. We agreed that those instructions were legitimate, but at this point it appears as though they are getting information that they have not asked for and I do believe that giving them a copy of the written instructions is improper and will carry undue influence in the jury room.

. . .

It's in the discretion of the Court as to -- actually, I've never had a trial where the jurors have been given a copy of the written instructions, ever. It's in the discretion of the Court.

I think at the very beginning, when it's discussed, to alleviate any concerns regarding, you know, what was read to them, a copy should be given.

Now, we have almost nine notes indicating very heated debates. We have some notes that some jurors were accusing other jurors of not looking at the facts as the Court instructed them to. This is my concern with a copy of the written instructions. There might be a basis for legitimately giving them a copy of the written instructions at the very beginning. There might be a good reason for that, because it is a long set of instructions. They do need to understand. But here in this case, it didn't happen at the very beginning. It began last week, almost a week ago. They haven't asked to be reinstructed on any aspect of the law and they have obviously gotten to the point where they have legitimate differences and disagreements. And so now a juror can walk in with C-13 and say, "See, I told you were looking at this wrong. The judge had to give us a copy of the written instructions."

That's not right. We are inserting ourself into their deliberations. We all know that is wrong and it would be plain error and I believe it would deny Mr. Joseph Cody the right to a fair trial at this point.

. . .

Mr. Beam [Petitioner's counsel]: [I] [j]oin in the comments made by Mr. Moncur, on behalf of [Petitioner]. Just add one or two sentences.

If the jury had asked any questions along the way about which would indicate some confusion on their part about what the law is, then there might be a reason for your Honor to use your discretion to do something to remind them about the law, but as Mr. Moncur said, they have not done that.

It's clearly, from everything we heard from the jury, their dispute is about facts and evidence, not how to apply them to the law, but what they are and how they should be interpreted. And in that regard, don't see any reason for your Honor to exercise your discretion to give them the law at this point.

(*Id.* at 6-13.)

Petitioner's trial counsel joined in the objection of Petitioner's co-defendant's counsel and made his own objection to the trial court providing the jury with an *Allen* instruction. (*Id*. at 12-13). Petitioner cannot show that trial counsel representation here fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 688. Petitioner has failed to elaborate on how trial

counsel's objections were not result of reasonable professional judgment.  *See id.*, at 690.  As trial counsel clearly objected to the trial court's decision to give an *Allen* instruction, the Court does not find that Petitioner has shown trial counsel was ineffective. The Appellate Divisions decision on direct appeal was not contrary to or an unreasonable application of federal law. (ECF No. 18-5 at 33.) Petitioner also fails to establish that state court decision involved an unreasonable determination of the facts.

Petitioner's argument that appellate counsel was ineffective for failing to challenge the trial court's decision to give an *Allen* instruction also fails. Petitioner does not specify whether he is arguing that appellate counsel on direct appeal or collateral appeal were ineffective. However, as explained above, on direct appeal, Petitioner incorporated this argument, which was raised by his co-defendant, into his direct appeal claims. Direct appeal counsel did not need to raise the claim, as Petitioner had already raised it. The Appellate Division denied the claim as meritless, finding it did not warrant further discussion. (ECF No. 18-5 at 33.) On collateral appeal, the PCR court found that any claim regarding the trial court's decision to give the *Allen* instruction was procedurally barred. (ECF No. 18-7 at 24.) Appellate counsel cannot be found ineffective for failing to then raise to the Appellate Division a claim that the PCR court found was barred.  Petitioner has failed to meet either prong of the *Strickland* standard. As such, Petitioner's third ground for habeas relief is denied.[2]

---

[2] It is unclear if Petitioner is arguing that trial counsel and appellate counsel should have objected specially to the trial court statement to the jury that "the court will receive either a verdict sheet or further communication from the jury as you deem it appropriate." However, Petitioner makes no argument regarding why that statement needed to be objected to or what objection should have been made. The trial court did not tell the jury that they must return a verdict sheet. Rather, the trial court instructed that they should return a verdict sheet <u>or</u> further communicate with the court as the jury deemed appropriate. As the trial court was simply instructing the jury to either communicate further with the court or return the verdict sheet, an objection to this statement would

**B.  Grounds Four and Five: Trial Court Error, Admitting Evidence of Identification**

In grounds four and five, Petitioner argues that the trial court erred in admitting into evidence the "impermissibly suggestive" show-up identification of the victim. (ECF No. 10 at 25–31.) Petitioner argue that police failed to provide a recording or detailed summary of their communications with the victim before, during, and after the show-up as required by *State v. Delgado*, 188 N.J. 48 (2006). (*Id.*) Petitioner claims that the identification was unreliable because the victim only had a brief opportunity to view the assailants, the victim was unable to provide a prior description, and the victim's vision was impaired from his injury. (*Id.* at 25.)

Petitioner raised this claim on direct appeal and the Appellate Division found it meritless. (ECF No. 18-5 at 33.) The Appellate Division summarized the facts relating to the show-up identification as follows:

> All three men were arrested and taken in separate cars back to the gas station to see if Singh could identify them. Before Singh saw [Petitioner] and Joseph, Rios told Singh that the men he would see may not have been involved in the crime and he was under no pressure to identify anyone. Singh identified both defendants as the ones who robbed and beat him. Specifically, Singh said [Petitioner] was the one who held him and Joseph struck him in the eye with a metal object. The show-up was partially recorded on the surveillance camera. Although there is no audio, the video contains a time reference which indicates that the show up began at 12:36 p.m., fifteen minutes after the robbery. Singh testified at trial that, when he identified defendants on April 20, 2012, he was one hundred percent sure that they were the people who robbed him.
>
> Prior to trial, the judge conducted a *Wade*[3] hearing to determine the admissibility of Singh's out-of-court identification of defendants. Sergeant David Robinson, the first officer to respond to the gas station, testified that he had difficulty communicating with Singh

---

have been meritless. Counsel cannot be found ineffective for failing to raise a meritless claim. *Sanders*, 165 F.3d at 253.

[3] *United States v. Wade*, 388 U.S. 218 (1967).

because of a language barrier, so Mandeep Kaur, a woman who also worked at the gas station, translated for him.

Although Singh had sustained injuries to his eye and was bleeding, Robinson found that he was very alert. After defendants were arrested, Robinson radioed to the officers to bring them to the gas station to see if Singh could make an identification.

When the officers arrived, Robinson told them to bring out each defendant, one at a time. When they were presented for identification, both defendants were handcuffed with their hands behind their backs and were each accompanied by two uniformed police officers.

Singh identified Joseph as the officers were still transporting him from the car. Singh noted Joseph's braids and said he was the one who hit him. Singh also quickly pointed at and identified [Petitioner] when he was brought out. Robinson did not prepare any documents or make notes about his interactions with Singh.

The judge found that the show-up identification was suggestive, but after hearing only Robinson's testimony, he ruled that he did not have enough evidence to resolve the question of whether the identification was sufficiently reliable to be admitted at trial.

The State then called Singh, who testified through an interpreter that he recognized defendants and was very sure of his identification. Singh stated that he saw the face of the person who grabbed him from behind when that person released him. He described the person who grabbed him from behind as being shorter than him and having a lighter complexion than the person in front of him. Singh said that both individuals were clean-shaven, and the person who grabbed him was wearing a muddy, yellow-colored shirt.

The judge then denied defendants' motions to suppress the out-of-court identification by Singh. He found no evasiveness by either witness and noted that Singh's difficulty with English may have accounted for some of the inconsistencies in his descriptions. The judge determined that the show-up identification was suggestive because defendants were shown to the victim in handcuffs and accompanied by uniformed officers. Also, the victim was in a position to see both defendants together before they were separately displayed.

Despite its suggestiveness, the judge found that the identifications were sufficiently reliable. The judge noted that, during the robbery,

> Singh had the opportunity to observe the face of both defendants as
> they ran away, and the subsequent identifications took place within
> fifteen minutes of the incident. The judge found that the level of
> confidence Singh expressed in his identifications during the hearing
> was corroborated by the speed at which the show-up identifications
> were made.

*Cody*, 2016 WL 3369531 at *3-4.

The Appellate Division denied Petitioner's claim providing the following

thorough analysis:

> [Petitioner's co-defendant,] Joseph [Cody] argues that the trial judge
> erred by admitting the show-up identifications at trial because the
> police failed to make a written record of the identification procedure
> as required by *State v. Delgado*, 188 N.J. 48 (2006). He also argues
> that the identifications should not have been admitted because they
> were unreliable due to the victim's brief opportunity to view the
> assailants, the impairment of the victim's perception due to stress
> and injury, and the inconsistencies in the description of the
> assailants that the victim later provided. [Petitioner] also argues that
> the show-up identifications were inherently suggestive and
> unreliable.
>
> A trial court's findings at a hearing on the admissibility of
> identification evidence are entitled to very considerable weight.
> *State v. Adams*, 194 N.J. 186, 203 (2008). The trial court's decision
> to admit identification testimony should be upheld if there is
> sufficient credible evidence in the record to support its decision.
> *Ibid.*
>
> Out-of-court identifications which result "from impermissibly
> suggestive procedures" are inadmissible at trial. *State v. Smith*, 436
> N.J. Super. 556, 564 (App.Div.2014). Although show-up
> procedures are suggestive, they are a permissible tool with an
> "indicia of reliability" because they are bolstered by the fact that
> they occur close in time and place to the event. *Id.* at 567. However,
> because a victim may only be presented with one suspect who is in
> police custody, there is a danger that show-up procedures are too
> suggestive. *Ibid.*
>
> The suggestiveness of a show-up identification can be influenced by
> several factors, including whether the show-up was performed more
> than two hours after the event, and whether the police warned the
> witness that the suspect may not be the perpetrator and that the

witness should not feel compelled to make an identification. *State v. Henderson*, 208 N.J. 208, 290 (2011).

. . .

The trial judge held that the two-prong test articulated by the United States Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L. Ed.2d 140, 154 (1977), and adopted by our Supreme Court in *State v. Madison*, 109 N.J. 223, 232–33 (1988), applied because Singh's identification occurred before the Court adopted the model jury charges on eyewitness identification in *Henderson*, *supra*. Neither defendant challenges this ruling.

Under the *Manson/Madison* framework, the judge must first decide whether the procedure in question was impermissibly suggestive. *Madison*, *supra*, 109 N.J. at 232. If so, the judge must then decide whether the objectionable procedure resulted in a "very substantial likelihood of irreparable misidentification." *Ibid.* (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247, 1253 (1968)). In carrying out this analysis, the judge must focus on the reliability of the identification. *Ibid.* If the judge finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence. *Ibid.*

In assessing reliability, the judge must consider five factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *State v. Herrera*, 187 N.J. 493, 507 (2006) (quoting *Manson*, *supra*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L. Ed.2d at 154).

Singh had an opportunity to view his assailants in bright sunlight and at close range, and the certainty of his identifications were apparent on the surveillance video. Singh was also not under the influence of alcohol or drugs, and only fifteen minutes elapsed between the time of the robbery and the identifications. The other evidence at trial bolstering reliability included Brown's observation of both defendants in the park shedding clothing minutes after he was given a description of the robbers by Bellamy; his following of defendants until their apprehension; and the large amount of cash found hidden in [Petitioner's] waistband.

> However, the most compelling evidence supporting reliability is the surveillance video showing Singh walking around the front of the truck followed less than one minute later by two men who proceeded to the same location. Given the timing, the jury could have reasonably concluded that the two men following Singh were indeed the robbers, and the very distinctive cross design appearing on the back of the shirt worn by the second man in the video was identical to the design on the shirt found in the Nissan minutes after the robbery. We are satisfied that the show-up identifications, while suggestive, were sufficiently reliable to be presented to the jury.

*Id.* at *5–7.

First, Petitioner's claim that police failed to comply with *Delgado* because there was no written record or recording made of the show-up identification procedure raises an issue of state law and, therefore, does not provide a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("federal habeas corpus relief does not lie for errors of state law") (internal quotation marks omitted).

As to Petitioner's argument that the identification was unreliable, the Supreme Court's decisions in *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977), set forth the standard for when the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Supreme Court emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. *Id.*, at 107; *Biggers*, 409 U.S. at 198. Crucially, "[e]ven when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (citing *Brathwaite*, 432 U.S. at 112–13; *Biggers*, 409 U.S. at 198–99).

The Court held that exclusion was not compelled without consideration of reliability of the identification, considering factors laid out in *Neil*, including:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Brathwaite*, 432 U.S. at 114. Ultimately, a court must determine whether "under all the circumstances of th[e] case there is 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 116 (quoting *Simmons v. U.S.*, 390 U.S. 377, 384 (1968)).

The Appellate Division applied clearly established federal law to determine the admissibility of the identification and reasonably found that the identification, while suggestive, was sufficiently reliable for presentation to the jury. (ECF No. 18-5 at 17–19). The Appellate Division explained that the victim saw Petitioner and the other assailant in bright sunlight and at close range; he was not under the influence of alcohol or drugs; he was certain in his identification; the surveillance video showed his certainty; and only fifteen minutes had elapsed between the robbery and the identification. (*Id*. at 18–19). The state court also considered other evidence of record that bolstered the identification reliability. (*Id*.) The court noted that the distinctive design on the shirt found in the vehicle Petitioner was in matched that of one of the assailants from the surveillance video. (*Id*.)

Considering this record, Petitioner has not shown that the Appellate Division's denial of this claim was contrary to or an unreasonable application of clearly established federal law, nor has he shown that it was based on an unreasonable determination of the facts in light of the evidence presented. *See*, *e.g.*, *Blount v. Davis*, No. 19-409, 2022 WL 807430, at *5 (D.N.J. Mar. 17, 2022) (finding no error in Appellate Division's determination that identification was sufficiently reliable where "the show-up occurred within two hours of the incident, the victim immediately identified defendant without any uncertainty, the distance discrepancy between the

34

victim and defendant at the show-up was minor, and nothing obstructed defendant's view of defendant.") Therefore, Petitioner is denied habeas relief as to grounds four and five.

### C. Ground Six: Trial Court Error in Admitting Evidence

In ground six, Petitioner argues that the trial court erred in admitting hearsay evidence of the audio recordings from (1) the 911 tape, which included Mandeep Kaur's observations following the robbery, and (2) the fire dispatch tape, which included off-duty firefighter Brown's observation. (ECF No. 10 at 31-34). Petitioner argues that the admission of this evidence violated his confrontation rights. (*Id.*)

Petitioner raised this claim on direct appeal and the Appellate Division denied it. The Appellate Division found as follows:

> [Petitioner] argues that the portions of the audio recordings of the 911 call, police dispatch communications, and fire dispatch communications admitted at trial were inadmissible hearsay and a violation of the Confrontation Clause.
>
> On the 911 tape, the voice of Mandeep Kaur, Singh's co-worker, can be heard requesting an ambulance at the Getty gas station because there had been a robbery and the victim was bleeding and "got hurt really bad." On the dispatch tape, Firefighter Brown can be heard calling his dispatch and reporting that he was following two men who just beat up a gas station attendant.
>
> At first, the men were walking, but Brown then reported observing them getting into a gold Nissan Maxima. As Brown was following the Nissan northbound on Frelinghuysen Avenue, he reported that a police car was approaching from the opposite direction. He told dispatch to relay to the police to make a U-turn, which they did. Brown continued to follow the Nissan until the police stopped it and took the occupants into custody. Brown confirmed that the police "got the right car."
>
> Newark police dispatch tapes contain the reports of the robbery from the identification and stop of the Nissan to the subsequent apprehension of defendants.

After a pretrial hearing on the State's in limine motion to admit the recordings, the trial judge, relying on *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273–74, 165 L. Ed.2d 224, 237 (2006), found that the 911 recording was non-testimonial as it was made to resolve a present emergency; events were discussed as they were occurring; and the purpose of the call was to solicit police assistance for an ongoing emergency.

While Mandeep Kaur's 911 call is hearsay under N.J.R.E. 801(c), it meets the criteria for admission pursuant to the present sense impression exception to the hearsay rule. A present sense impression is "[a] statement of observation, description or explanation of an event or condition made while or immediately after the declarant was perceiving the event or condition and without opportunity to deliberate or fabricate." N.J.R.E. 803(c)(1). A present sense impression is admissible regardless of the availability of the declarant to testify at trial. N.J.R.E. 803(c). Here, during her call, Kaur noted her observations of Singh's injuries, including his swollen face and that he was bleeding and "hurt really bad."

The judge also found Brown's recorded observations of defendants, as reported to his dispatch, were admissible as non-testimonial present sense impressions. The judge did not admit the entirety of the recording, finding that once defendants were in custody, and Brown reported "they got 'em," the emergency was over.

Brown reported the events contemporaneously, as he observed them, and had no "opportunity to deliberate or fabricate." N.J.R.E. 803(c)(1). This enhances the reliability of the statements. Also, Brown testified at trial and repeated much, if not all, of what is contained on the dispatch tape.

We review a trial judge's evidentiary rulings for an abuse of discretion. *State v. Marrero*, 148 N.J. 469, 483 (1997). We find no abuse of discretion on the trial judge's rulings admitting the 911 call and portions of the dispatch tapes.

*Cody*, 2016 WL 3369531 at *9–10.

At the outset, the Court notes that, at the state level, a challenge to the state court's evidentiary ruling under New Jersey Rules of Evidence does not raise a federal habeas claim. The United States Supreme Court has held that "federal habeas corpus relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (U.S. 1990)). "[I]t

is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68 (quoting 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (U.S. 1975)).

Additionally, it is well-settled that "[a] federal court considering a petition for habeas relief should not merely review state evidentiary errors, as any such mistakes 'are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial.'" *Keller v. Larkins*, 89 F.Supp.2d 593, 604 (E.D. Pa. 2000) (quoting *Bisaccia v. Atty. Gen.*, 623 F.2d 307, 312 (3d Cir. 1980)). Thus, to the extent Petitioner brings this claim as a challenge to the trial court's evidentiary ruling, this is not a cognizable claim and Petitioner is not entitled to habeas relief.

Petitioner's Confrontation Clause claim is meritless. The Confrontation Clause guarantees a criminal defendant the right to confront "the witnesses against him." U.S. Const. amend. VI. "The Fourteenth Amendment renders the [Confrontation] Clause binding on the States." *Michigan v. Bryant*, 562 U.S. 344, 352 (2011) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)). The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). "As to the second requirement, the Confrontation Clause requires that a defendant have had 'a full and fair opportunity to probe and expose [testimonial] infirmities' of an unavailable government witness in order for that witness's prior testimony to be admissible." *Ross v. Dist. Attorney of Cnty. of Allegheny*, 672 F.3d 198, 206–07 (3d Cir. 2012) (citing *United States v. Owens*, 484 U.S. 554, 558 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15 (1985))).

37

In *Davis v. Washington*, 547 U.S. 813 (2006), the Court expanded on its *Crawford* holding. In *Davis*, the Court held that a statement in response to a 911 operator's questioning was not testimonial, as it was made for the purpose of aiding an ongoing emergency. *Id.* at 828. The Supreme Court defined "testimonial" and "nontestimonial" statements as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822. While the Court reasoned that such questioning could rise to the level of an "interrogation" that could produce testimonial statements, in this case, the statement was made "as [the events] were actually happening, rather than describ[ing] past events." *Id.*, at 827 (internal quotations and citations omitted). Further, the call to 911 was "plainly a call for help against a bona fide physical threat." *Id.* Therefore, the Court held that the statements made to the 911 operator would not be barred by the Confrontation Clause.

The Appellate Division cited to *Davis* when affirming the trial court's finding that the 911 recording and the fire dispatch recording were non-testimonial and fit the present sense impression exception to the hearsay rule. (ECF No. 18-17 at 11–16.) Therefore, the Appellate Division's decision was not contrary to fairly established federal law.

The Appellate Division's decision also did not involve an unreasonable application of *Davis*. The Appellate Division found the 911 recording and the portion of the fire dispatch recording that was admitted were non-testimonial present sense impressions. (*Id* at 11.) The Appellate Division noted that the 911 recording was made to resolve a present emergency and the call was made to procure police assistance in an ongoing emergency. (*Id.*) The trial court explained

38

that Ms. Kaur made observations about the physical condition of the victim and the fact that he was bleeding, she made the call within moments of the actual incident, and responded to inquires may by the 911 dispatcher. (ECF No. 18-17 at 11–16.) The Appellate Division also noted that Brown reported the events he that occurred contemporaneously, as he observed them. The trial court found the Brown was actively pursuing the vehicle and actively observing events and describing an on-going emergency as he followed the vehicle. (*Id.* at 15.) Given the record, the Court finds that the Appellate Division's finding regarding the non-testimonial nature of both the 911 call and the fire dispatch constituted a reasonable application of *Crawford* and *Davis*. Since both the 911 call and the fire dispatch items were non-testimonial, the admission of those items did not violate Petitioner's Sixth Amendment right to confrontation. Accordingly, Petitioner's sixth ground for habeas relief is denied.

### D.  Ground Seven: Sufficiency of the Evidence

Petitioner next argues that the trial court erred in denying his motion for judgment of acquittal. (ECF No. 10 at 34–35.) Petitioner claims that the evidence against him was insufficient because the identification evidence presented at trial was "so unreliable that [it] could not establish the proofs beyond a reasonable doubt." (*Id.*)

The Appellate Division rejected this claim on direct appeal. *Cody*, 2016 WL 3369531 at *13 ("Defendants' remaining arguments lack sufficient merit to warrant further discussion in our opinion. R. 2:11–3(e)(2).") "In considering a § 2254 petition, we review the 'last reasoned decision' of the state courts on the petitioner's claims." *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008)). Here, the Court "look[s] through" the Appellate Division's summary denial and applies AEDPA's standards to the

trial court's determination. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The Court "presume[s]

that the unexplained decision adopted the same reasoning." *Id.*

    The trial court denied Petitioner's motion for judgment of acquittal, ruling as follows:

> Joseph Cody and [Petitioner] stand before this Court charged in a four-count indictment alleging membership in a conspiracy to commit robbery, robbery, unlawful possession of a weapon (identified as a blunt object) and possession of a weapon for an unlawful purpose.
>
> Giving the State, again, the benefit of all the reasonable inferences, the Court will deny the application.
>
> We heard the testimony of Mr. Singh. He testified on or about April 20, 2012, he was working at the gas station at the corner of Frelinghuysen and Meeker, he was approached by two individuals, one who grabbed him from behind while the other struck him repeatedly in the face with a blunt object, described as a steel bracelet.
>
> Mr. Singh further testified that moneys were taken from his pocket, which he estimated to be in the amount of $600 to $700.
>
> The Court heard testimony from Newark Police Officers that within 20 minutes or so of the alleged incident, what is known within the court system as a show-up identification was made wherein the victim identified both [Petitioner] and Joseph Cody as participants in this robbery. The identification -- the witness stated he was one hundred percent certain. The identification is corroborated with the video of the gas station, the testimony of Miss Bellamy, also known as Scooter Lady, the testimony of the Newark Fire Department, the officer that followed the vehicle and called it in.
>
> Essentially, Scooter Lady testified that she observed an assault, gave a description of the flight to the Newark Fire Department officer. The fire department officer pursued the individuals as they went up, Meeker and along Weequahic Park. He was observed ducking into a line of parked cars, consistent with the individuals entering into a car. He also testified that he saw at least one of the individuals trying to change the clothing. The officer followed that car, Newark Police stopped the vehicle. Within the vehicle were [Petitioner] and Joseph Cody. On the floor of the front passenger seat where Joseph Cody was arrested was a shirt with what appeared to be a cross affixed to it, which was discarded at the feet. There was also an indication of

an individual walking across the actual gas station on or about the time of the assault wearing a similar shirt. There was testimony that the officer, at the time of the stop, observed Victor Cody adjusting his pants. Within his pants was recovered in excess of $1300 of cash in various denominations, corroborating the testimony of Mr. Singh that cash was taken from his person.

Sufficient evidence of the use of force during the commission of a theft. There is sufficient circumstantial evidence that there was concerted action between the two individuals, one holding while the other striking and taking the money from the pocket.

If the jury finds there was, in fact, a conspiracy and that was within the scope of the conspiracy, each of the separate actions are attributable to each defendant, the second charge of possession of a deadly weapon is sustained because the deadly weapon is one capable of inflicting serious bodily injury.

There was the testimony of Mr. Singh that based upon the repeated striking to his eye area, he lost the ability to see, providing sufficient evidence of serious bodily injury. That the object as used is a deadly weapon, consistent with the case law finding that repeated strikes to the head with a blunt object is sufficient to serious bodily injury. Whatever the bracelet's lawful use was is not to strike individuals, providing sufficient evidence from which the jury could find unlawful possession other than a firearm and also the possession of a weapon for an unlawful purpose, that purpose is to facilitate the commission of a robbery, providing an adequate evidence before the jury, based upon all the inferences, to sustain the count of possession for an unlawful purpose.

Once again, -giving the State the benefit of all reasonable inferences, there was sufficient evidence for this jury, for them to consider each and every one of the four counts alleged in the indictment. So for the reasons submitted on the record, the motion for judgment of acquittal is denied.

(ECF No. 18-20 at 91–94.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Travillion v. Superintendent Rockview SCI*, 982 F.3d 896, 902 (3d Cir. 2020) ("[T]he clearly established federal law governing the insufficient evidence claim is the standard set out by the Supreme Court in *Jackson* . . . .").

The dispositive question under *Jackson* is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." 443 U.S. at 318. Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). The analysis under *Jackson* requires courts to analyze the "substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. In conducting this review, "all of the evidence is to be considered in the light most favorable to the prosecution." *Id.*; *see also Orban v. Vaughn*, 123 F.3d 727, 731 (3d Cir. 1997). Thus, where the evidence could support conflicting inferences, the habeas court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution." *Jackson*, 443 U.S. at 326; *see also Cavazos v. Smith*, 565 U.S. 1, 7 (2011). "What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico*, 559 U.S. at 773 (2010) (internal quotation marks omitted).

Petitioner's claim is premised on the argument that the identification evidence was unreliable and was, therefore, insufficient to support the guilty verdict. "[U]nder *Jackson*, the assessment of credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The question is "whether, viewing the evidence in the light most

favorable to the state, it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could have found, beyond a reasonable doubt that [petitioner] was guilty [.]" *Kamienski v. Hendricks*, 332 F. App'x 740, 747 (3d Cir. 2009). The trial court explained that the victim was "one hundred percent certain" in his identification. *Cody*, 2016 WL 3369531, at *3. Additionally, the other evidence corroborated that identification. In particular, Ms. Bellamy told firefighter Brown which direction the assailants fled, Brown gave chase and saw Petitioner and two other individuals removing clothing and entering a vehicle, police officers stopped the vehicle identified by Brown and recovered a shirt that was similar to the shirt shown on surveillance video from the location of the robbery. (ECF No. 18-25 at 32–33.) Finally, the state court found the victim's testimony—that he was repeatedly struck in the head and suffered injuries to his eye—provided evidence to support the unlawful possession of a weapon and possession of a weapon with an unlawful purpose charges. The state court concluded that, giving the state the benefit of all reasonable inferences, there was sufficient evidence to support the jury's verdicts of guilty beyond a reasonable doubt. Therefore, the New Jersey court's adjudication of Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable application of *Jackson* and its progeny, and Petitioner is not entitled to habeas relief on Ground seven of his petition.

### E.  Ground Eight: Trial Court Erred in Giving an Incomplete Jury Instruction

In ground eight, Petitioner argues that the trial court gave an incomplete identification jury instruction on the victim's cross-racial identification. (ECF No. 10 at 36–38.) Petitioner argues that the trial court omitted language from the model identification charge. He claims the identification instruction did not advise the jury (1) to consider what was or was not said to Mr. Singh; (2) whether Mr. Singh was told that the perpetrator may or may not be in the show-up; and

(3) the effect feedback and the opinions and the descriptions of others had on Mr. Singh's identification. (*Id.*)

Petitioner challenged the jury instruction on direct appeal and the Appellate Division found the claim meritless. The Appellate Division denied the claim, finding:

> For the first time on appeal, both defendants challenge the identification charge given to the jury and claim it omitted portions of the model jury charge pertaining to out-of-court identifications. Joseph Cody also argues in his *pro se* brief that the judge erred by providing a defective cross-racial identification charge because the judge did not specifically tell the jury that Singh was not of the same race as defendants.
>
> . . .
>
> When evaluating a claim of error in a jury charge, we must consider the overall effect of the entire jury charge. *State v. Savage*, 172 N.J. 374, 387 (2002). A portion of a charge alleged to be erroneous cannot be dealt with in isolation, but should be examined as a whole to determine its overall effect. *Ibid.*
>
> If reliability of an out-of-court identification is at issue, the trial court is required to provide a "detailed charge directed to the contested facts relevant to the claim." *State v. King*, 390 N.J. Super. 344, 361 (App. Div.), certif. denied, 190 N.J. 394 (2007). Also, if a "cross-racial identification is not corroborated by other evidence giving it independent reliability," the court should include an instruction that "inform[s] the jury about the possible significance of the cross-racial identification factor" so that the jury may "pay close attention to a possible influence of race." *State v. Cromedy*, 158 N.J. 112, 132–33 (1999).
>
> Defendants claim the judge failed to instruct the jurors that they should consider what was or was not said to Singh prior to his viewing of defendants in the show-up, including whether Singh was told that the perpetrator may or may not be present and that Singh should not feel compelled to make an identification. Defendants also claim the jurors should have been instructed that feedback from police or other witnesses could affect the independent nature and reliability of the victim's identifications.
>
> The trial judge instructed the jury that the State has the burden of proving the identity of the person who committed the crime and that the jury "must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but whether the

State has proven beyond a reasonable doubt that this defendant is the person who committed it."

The judge instructed the jury that eyewitness identification must be "scrutinized carefully" and "[a]lthough nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony." The judge discussed the following factors: the witness's opportunity to view the perpetrators; stress; duration; weapon focus; distance; lighting; prior description; confidence and accuracy; and time elapsed between the commission of the crime and the identification.

As to the show-up identification, the judge informed the jury that the procedure was suggestive and they should consider what was done and said by the police:

> In evaluating the reliability of a witness's identification, you should also consider the circumstances under which any out-of-court identification was made and whether it was result of a suggestive procedure. In that regard, you may consider everything that was done and said by law enforcement to the witness during the identification process. You should consider that, in this case, each witness was—strike that.

> In this case, the single witness, Mr. Singh, identified the defendant during a show-up. That is, a defendant was the only person shown to the witness at that time. Even though such a procedure is suggestive in nature, it is sometimes necessary for the police to conduct a show-up or one-on-one identification procedure. Although the benefits of a fresh memory may balance the risk of undue suggestion, show-ups conducted more than two hours after an event present a heightened risk of misidentification. Also, police officers must instruct the witness that the person they are about to see may or may not be the person who committed the crime and that they should not feel compelled to make an identification. In determining whether the identification was reliable or the result of an unduly suggestive procedure, you should consider how much time elapsed after the witness last saw the perpetrator, whether the appropriate instructions were given to the witness, and all other circumstances surrounding the show-up.

Contrary to Joseph Cody's *pro se* argument, the judge instructed the jury as to the cross-racial aspects of Singh's identification:

45

> Cross-racial effects: Research has shown that people may have greater difficulty in accurately identifying members of a different race. You should consider whether the fact that a witness and the defendant are not of the same race may have influenced the accuracy of the witness's identification.
>
> We perceive no error, let alone plain error, in the trial judge's jury instructions. R. 2:10–2.

*Cody*, 2016 WL 3369531, at *7–9.

That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle*, 502 U.S. at 71–72), cert. denied, 534 U.S. 919 (2001). A petitioner can therefore only show an entitlement to habeas relief based upon allegedly inadequate jury instructions where the petitioner proves that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). That a challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief; a petitioner can only prevail on such a claim by showing that the instruction rendered his trial fundamentally unfair. *Id.* Additionally, courts may not judge the instruction in isolation, but must consider the instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72.

Where the error is the omission of an instruction, a petitioner's burden is "especially heavy" because an omission is "less likely to be prejudicial than a misstatement of the law." *See id.* at 155. In that case, a petitioner must demonstrate that the omission was so "inconsistent with the rudimentary demands of fair procedure" as to result in a miscarriage of justice. *See Smith v. Arvonio*, Civ. No. 93-25, 1994 WL 327123, at *3 (D.N.J. June 24, 1994) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).

46

Petitioner argues that the trial court erred in omitting specific model jury instructions. Petitioner argues that the trial court should instructed the jury that "identification procedures should begin with instructions to the witness that the perpetrator may or may not be in the array and that the witness should not feel compelled to make an identification." (ECF No. 10 at 36.) Petitioner also argues that the trial court should have instructed the jury to consider whether the witness received feedback from police officers and whether the witness was exposed to opinions or descriptions. (*Id.* at 36–37.) The Appellate Division explained that the trial court instructed the jury that eyewitness identification must be "scrutinized carefully" and the judge discussed an array of factors the jury was to consider. *Cody*, 2016 WL 3369531, at *8. The judge then instructed the jury that they "may consider everything that was done and said by law enforcement to the witness during the identification process" and that "police officers must instruct the witness that the person they are about to see may or may not be the person who committed the crime and that they should not feel compelled to make an identification." *Id*. Although the trial judge may not have followed the exact model charge Petitioner presents here, the instructions Petitioner claims the judge omitted were clearly given to the jury.

Petitioner has not met the "especially heavy" burden of showing the omission of the model charge resulted in a miscarriage of justice. *Estelle*, 502 U.S. at 155. The trial judge provided the jury with a charge that contained the instructions Petitioner is arguing were omitted. Accordingly, Petitioner has failed to show that the trial court erred in failing to provide the model charge, or that his conviction is a violation of due process. As Petitioner has not demonstrated a wrong of constitutional dimension sufficient to warrant federal habeas relief, ground eight will be dismissed.

**F.  Ground Nine: Trial Court Erred in Allowing Other Bad Acts Evidence**

In his final ground of habeas relief, Petitioner argues that the trial court improperly allowed the admission of other bad acts into evidence. (ECF No. 10 at 39–40.) Petitioner claims that the testimony from police officer Rios regarding Petitioner's refusal to show his hands when police stopped the Nissan amounted to evidence of other bad acts. (*Id.*) Petitioner argues that evidence of other bad acts that are not at issue in the case at hand has a prejudicial effect. (*Id.*)

Petitioner raised this claim on direct appeal and the Appellate Division denied the claim, finding it "lack[ed] sufficient merit to warrant further discussion." *Cody*, 2016 WL 3369531, at *13.

Petitioner is challenging the trial testimony of Officer Rios. At trial Rios testified that he approached the gold Nissan that Petitioner was in and instructed the three individuals inside to show their hands. (ECF No. 18-19 at 44–45.) Rios testified that while the two front passengers showed their hands, the back passenger, later identified as Petitioner, failed to comply with the order. (*Id.* at 45.) Rios testified that Petitioner "had his hands towards his waistband" and Rios "again instructed him to produce his hands." (*Id.*) Petitioner "again failed to do so, at which time [Rios] produced [his] service weapon and instructed him to show [police] his hands." (*Id.*) Rios testified further that once Petitioner complied and the occupants were removed from the vehicle, the occupants were patted down, at which time it was revealed that Petitioner "was actually trying to conceal a bundle of money in his waistband." (*Id.* at 46.)

The Supreme Court has never held that evidence of prior bad acts – even when they amount to other crimes – must be excluded from criminal trials, nor that a curative instruction or other restriction is per se required for a criminal conviction to survive constitutional scrutiny where such evidence is admitted. *See generally Estelle*, 502 U.S. 62; *Greer v. Miller*, 483 U.S. 756 (1987); *Spencer v. Texas*, 385 U.S. 554 (1967); *see also Minett v. Hendricks*, 135 F. App'x 547, 553

48

(2005). As with most state court evidentiary decisions, the admission of such evidence will only warrant habeas relief where the admission of the evidence was so unduly prejudicial that it rendered the petitioner's trial fundamentally unfair. *Glenn v. Wynder*, 743 F.3d 402, 407; *Minett*, 135 F. App'x at 553.

Officer Rios's testimony pertained to Petitioner fleeing from the crimes he was charged with and convicted of. The testimony was relevant to Petitioner's apprehension and the discovery of the money in Petitioner's waistband. It is clear that the admission of Officer Rios testimony was relevant to the crimes Petitioner was charged with and was not introduced only as evidence of other bad acts. As the admission of the alleged other bad acts evidence did not render Petitioner's trial fundamentally unfair, the admission of that evidence serves as no basis for habeas relief. As such, the state court's denial of this claim was neither contrary to or an unreasonable application of federal law, and this claim provides no basis for habeas relief. Accordingly, Petitioner's petition for writ of habeas corpus is denied.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus (ECF No. 10) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.  An appropriate order follows.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  December 17, 2025